PJS:JJB:mel

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JASPER RIVERA,** | : | **No. 3:CV-12-1339** |
| **Plaintiff** | : | |
| | : | |
| | : | **(Kosik, J.)** |
| **V.** | : | **(Carlson, M.J.)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Defendant** | : | **Filed Electronically** |

## REPLY BRIEF IN SUPPORT OF THE UNITED STATES' MOTION SUMMARY JUDGMENT

Respectfully submitted,

PETER J. SMITH
United States Attorney

s/ Justin Blewitt
JUSTIN BLEWITT
Assistant U.S. Attorney
PA 01710
MICHELE E. LINCALIS
Supv. Paralegal Specialist
P.O. Box 309
Scranton, PA 18501-0309
Phone:   (570) 348-2800
Facsimile: (570) 348-2830
Justin.Blewitt@udoj.gov

Date:   March 8, 2013

The United States of America respectfully submits this reply brief in support of its Motion for Summary Judgment.

## I.   Supplemental Factual Background

As set forth in Defendants' Statement of Material Facts, the BOP monitors and controls the transfer, temporary release and community activities of certain inmates who present special needs for management.   SMF ¶ 1; Ex. 11 (Declaration of James Fosnot), ¶ 3.   Such inmates are known as Central Inmate Monitoring Cases (CIM) and require a higher level of review for transfers, temporary releases or community activities.   SMF ¶ 2; Ex. 11, ¶ 3.   This monitoring is done to provide protection to all concerned and to contribute to the safe and orderly operation of the federal institutions.   SMF ¶ 3; Ex. 11, ¶ 3.

The CIM category of "Separation" includes inmates who may not be confined in the same institution, unless the institution has the ability to prevent any physical contact between the separatees.   SMF ¶ 5; Ex. 11, ¶ 4.   Factors to be considered in categorizing an inmate as a "Separation" include whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals in the community or institution.   SMF ¶ 6; Ex. 11, ¶ 4.

There is a separate and distinct CIM category labeled "Disruptive Groups." Ex. 11 ¶ 5 and p. 7   (Program Statement 5180.05, Central Inmate Monitoring

System), 28 C.F.R. § 524.70.   Disruptive Group inmates are "[i]nmates who belong to or are closely affiliated with groups (e.g. prison gangs), which have a history of disrupting operations and security" of correctional institutions.   Id.   The BOP recognizes five different Disruptive Groups:   Black Guerilla Family; Aryan Brotherhood; Mexikanemi ; Mexican Mafia; and Texas Syndicate.   Ex. 11 ¶ 6.

The BOP also monitors another category of inmates that are labeled Security Threat Groups.   Id. ¶ 8.   Security Threat Groups can be gangs including, but not limited to: Latin Kings, Paisa, Dirty White Boys, Aryan Circle, Crips, Bloods, Black Gangster Disciples, Vice Lords.   Id.   Security Threat Groups also include (but are not limited to): inmates who are former law enforcement, sex offenders, threats to government officials, history of assault on officers, and many other categories.   Id.

The only groups that the BOP keeps completely apart from each other are: Mexican Mafia/Surenos from Texas Syndicate and Bario Azteca from the Border Brothers.   Id. ¶ 9.

According to BOP records, Rivera was a Tango Associate at the time of the altercation.   Id. ¶ 10.   Turning Bear was not affiliated with a gang at the time of the altercation.   Id. ¶ 11.   As such, there was no reason that Rivera and Turning Bear could not participate in recreation together.   Id. ¶ 12.

Inmates at USP Lewisburg (SMU Unit) are afforded the opportunity to participate in recreation five days per week, one hour per day.   See Ex. 10 (Declaration of Brent Taggart), ¶ 3.   Separation records are used to assure inmates who are separatees are not placed in recreation groups together.   Id.   Recreation is voluntary and an inmate can refuse to participate at any time before the time he is placed into a recreation pen.   Id.

If an inmate identifies a safety concern while being moved to recreation, he may be returned to his cell or placed in a holding cell or other area while the concern is looked into.   Id. ¶ 4.   He will not be placed into a different recreation cage since the separation records for those other inmates would not have been reviewed.   Id.

Inmates can raise safety/security concerns with any staff member.   Id. ¶ 5. If an inmate feels he cannot be housed or participate in recreation with another inmate, he can notify staff who will forward the information on (generally to a supervisor such as lieutenant or unit manager) as well as the special investigative staff ("SIS") who will investigate the claim.   Id.   The inmates will be unofficially kept away from each other pending the outcome of the investigation.   If the claims are substantiated, then the inmates become official separatees.   Inmates who are involved in an altercation against each other are immediately made separatees.   Id.

It is undisputed that Rivera has never requested to be separated from Turning Bear. SMF ¶ 15; Pl.'s Counter Statement of Facts (Doc. 37) ¶ 15.

J. Lesho is a Correctional Officer at USP Lewisburg.   See Ex. 11 (Declaration of J. Lesho), ¶ 1.   On June 4, 2010 (the day Rivera was assaulted by inmate Nicholas Turning Bear in the recreation pen at USP Lewisburg), Officer Lesho was attending offsite training.   Id. ¶ 3 and p. 7 (USP Lewisburg Daily Assignment Roster for June 4, 2010).   While Officer Lesho is familiar with Rivera, he has no recollection of Rivera raising any safety concerns to him prior to the altercation between them on June 4, 2010.   Had Rivera raised any such safety concerns, Officer Lesho would have notified the shift lieutenant and/or SIS.   Id. ¶¶ 2, 3.

R. Harvey is also a Correctional Officer at USP Lewisburg.   See Ex. 12 (Declaration of R. Harvey), ¶ 1.   Officer Harvey is familiar with both Rivera and Turning Bear and he recalls many conversations with Rivera prior to the June 4, 2010, incident.   Id. ¶¶ 2, 3.   He also recalls Rivera stating he did not like to go to recreation with Native American inmates, however, he never expressed any safety concerns, nor did he raise any safety concerns prior to June 4, 2010.   Id. ¶ 3.

While Officer Harvey tried to accommodate Rivera's preference of not recreating with Native American inmates when resources permitted, there were

4

times that the only available place to put Rivera was in a recreation pen with a Native American.   Id.

Officer Harvey was not working on June 4, 2010.   Id. ¶ 3 and p. 6 (USP Lewisburg Daily Assignment Roster for June 4, 2010).   Had Rivera raised any safety concerns prior to June 4, 2010, Officer Harvey would have notified the shift lieutenant and/or SIS.   Id.

USP Lewisburg has a screening procedure in place to prevent its staff from bringing sharpened instruments, firearms, or other hazardous materials into the institution.   Ex. 10, ¶ 2.   All BOP staff are required to clear the walk through metal detector at the front entrance of the institution and all bags and coats are x-rayed. Id. ¶ 2 and p. 4 (Inst. Supplement 5500.11A, Entrance Procedures).   If the staff member cannot clear the metal detector, a hand held metal detector is used for the alerted area.   Id.   If the hand held alerts on an area, but the screening officer can be "reasonably assured" that no unauthorized items are present, the screener can permit the staff member to enter the facility.   Id.

### III.   Reply Argument

Rivera seeks $12,000 in damages as a result of injuries sustained following an assault upon him by inmate Nicholas Turning Bear.   It is the United States' position that:   (A) Rivera's claims for injuries due to staff not keeping him separated from

Turning Bear and for the delay in responding to the emergency are barred by the

discretionary function exception; and, (B) Rivera's claim that prison officials failed

to check for weapons fails to state a prima facie claim of negligence.   <u>See</u> Br. in

Support of the United States' Mot. for Summ. J. (Doc. 26).

**A.**   **<u>Rivera's claims under the FTCA for injuries due to staff not keeping him</u>**
       **<u>separated from Turning Bear and for the delay in responding to the</u>**
       **<u>emergency are barred by the discretionary function exception.</u>**

In opposing the United States' discretionary function argument, Rivera argues

that "explicit procedures" --rather than discretionary decisions –"cover all four

aspects of Mr. Rivera's negligence claim" and preclude an entry of summary

judgment in Defendant's favor.   Pl.'s Br. in Opp'n (Doc. 38) at 5.   Each of

Rivera's four negligence claims and arguments will be addressed seriatim.

**1.**   **<u>"Metal detectors must be used to find and eliminate weapons</u>**
      **<u>whenever prisoners leave their cells."</u>**

In his Complaint, Rivera claims that prison officials had a duty to search

inmate Turning Bear to ensure he was not hiding a weapon prior to being placed in

the recreation cage.   <u>See</u> Compl. (Doc. 1) ¶¶ 31-32.   In his opposition brief, he

argues that "metal detectors must be used to find and eliminate weapons whenever

prisoners leave their cells."   <u>See</u> Pl's Br. in Opp'n (Doc. 38) at 5.   Specifically, it

is Rivera's argument that, "whenever prison staff conduct an inmate to recreation,"

the BOP's regulation set forth at 28 C.F.R. § 552.10 as well as USP Lewisburg's

Special Post Orders for Z Block mandate the use of "electronic screening with a

metal detector" in order to deter prisoners from possessing weapons.   See Pl's Br. in

Opp'n (Doc. 38) at 5-7.

Pursuant to 28 C.F.R. § 552.10,

> In order to further the safe, secure, and orderly running of its
> institutions, the Bureau of Prisons conducts searches of inmates and of
> inmate housing and work areas to locate contraband and to deter its
> introduction and movement. Staff shall employ *the least intrusive
> method of search practicable*, as indicated by the type of contraband
> and the method of suspected introduction.

28 C.F.R. § 552.10 (emphasis added).   Contrary to Rivera's belief, the regulation

does not impose a mandatory duty upon prison officials.   And in requiring the use

of "the least intrusive method of search practicable …," it actually calls upon the

officer to exercise discretion in determining what "least intrusive" search method

should be employed.   As aptly noted by the Ninth Circuit, § 552.10

> directs prison staff to 'employ the least intrusive method of search
> practicable, as indicated by the type of contraband and the method of
> suspected introduction.' … That is, the regulation explicitly confers
> discretion on prison staff to decide how to search …. in view of the
> particular threat presented and the practicalities of the situation.
> Because those regulations permit the prison staff to exercise discretion,
> we presume, …. that their exercise of that discretion here … -was
> grounded in policy considerations.

> Moreover, independent of any presumption, that discretion is the kind
> protected by the discretionary-function exception.   A prison official's
> judgment about how extensively to search a cell involves a balancing of
> the potential risk, on the one hand, against the inmate's interest in being
> free from overly intrusive searches, on the other.

Alfey v. United States, 276 F.3d 557, 565 (9th Cir. 2002)(emphasis added)

(citations omitted).   Clearly, the method employed by a prison official in searching

an inmate or his cell is discretionary and the discretionary function bars any claim in

this regard.

### 2.    "**Immediate response to an emergency is mandatory.**"

Rivera's Complaint avers that staff could have intervened sooner to stop

inmate Turning Bear from attacking him inside the recreation cage.   Compl. (Doc.

1) ¶ 39 ("It is believed that … there was at least two staff members armed with

pepper ball guns in the gun ports of the cage rec that could have been used to stop

the assault before Plaintiff received life threatening injuries.")   In his opposing

brief, Rivera argues that "immediate response to an emergency is mandatory."   See

Pl's Br. in Opp'n (Doc. 38) at 7.

The United States' summary judgment evidence reveals that as soon as

Officer Raker witnessed Rivera being assaulted, he immediately called for

assistance and ordered Turning Bear to stop.   SMF ¶¶ 47-48.   Staff responded,

Turning Bear was ordered to lay down on the ground three times, and when he knelt

down, but did not comply in laying completely down on the ground, Deputy Captain Snider launched two rounds from the pepper ball launcher.   Id.   ¶¶ 49-54.   See also Ex. 3 (Doc. 27-2) at 7 (Memorandum of 6/4/10 from Deputy Captain Snider). Turning Bear complied and laid down.   SMF ¶ 55; Ex. 3 (Doc. 27-2) at 7.

The United States maintains that the decision by staff of how to respond to the incident was imbued with discretion and, as such, was protected by the discretionary function exception.   See Br. in Support of the United States' Mot. for Summ. J. (Doc. 26) at pp. 8-13.   In response, Rivera argues that the following excerpt from a BOP policy statement requires prison employees to take immediate action when an emergency arises:   "Because failure to respond to an emergency may jeopardize the security of the institution, as well as the lives of staff or inmates, it is mandatory that employees respond immediately and effectively to all emergency situations."   See Pl's Br. in Opp'n (Doc. 38) at 7 (quoting Program Statement 3420.09, Standards of Employee Conduct, § 10(b)).   Notably, the same program statement also instructs employees "to obey the orders of their superiors at all times.   In an emergency situation, carrying out the orders of those in command is imperative to ensure the security of the institution."   Id., § 10(c) (Pl.'s Ex. 2).

There is no dispute that BOP employees are required to respond "immediately and effectively to all emergency situations" and, based on the summary judgment

9

evidence submitted in this case, this policy was followed.   The record reveals that,

within just a 5-minute span, the attack upon Rivera had commenced, staff

responded, Turning Bear complied with orders to cease his attack and knelt down,

two rounds from the pepper ball launcher were launched when Turning Bear failed

to lay down completely on the ground as ordered, he was restrained, Rivera exited

the recreation pen on his own free will, Turning Bear was subdued, and photographs

were taken.   SMF ¶¶ 47-59; Ex. 3 (Doc. 27-2) at 7.   While Rivera appears to allege

that Deputy Captain Snider used his discretion to just stand around and watch the

attack before using his pepper ball gun to stop the attack (Pl's Br. in Opp'n (Doc. 38)

at 7), this proves to be nothing more than an unsupported bold allegation as the

record is clear that such was not the case here.[1]   Id.

　　　While it is true that BOP policy requires prison employees to respond

"immediately and effectively to all emergency situations," the policy statement does

not in any way prescribe how or by what means staff should respond to emergencies.

―――――――――――――――

1 Rivera's counsel presumes that the BOP failed to preserve the videotape of the
incident, though she has not requested that it be made available to her.   (Doc. 40)
¶ 9.   The videotape was preserved and is in the possession of the United States.
The video has no sound and only shows the inside of the recreation cage and the
attack itself.   In any event, due to its lack of audio and limited scope of the frame, it
was not submitted in support of the instant motion as it is undisputed that the attack
occurred.

Absent such a mandate, the staff's actions are, by their very nature, discretionary.

Castro v. United States, 560 F.3d 381, 387 (5th Cir. 2009) (holding "When no

mandate exists ….the governmental action is considered discretionary.") (quoting

Garza v. United States, 161 F. App'x 341, 343 (5th Cir. 2005); Smith ex rel

Fitzsimmons v. United States, 496 F. Supp. 2d 1035, 1040 (D.N.D. 2007) (holding

"when no federal mandate is found, the employee's conduct is considered to be the

product of judgment or choice" and the discretionary function exception applies).

Thus, the correctional officers' actions in Rivera's case--as well as that of their

superior ranking Deputy Captain--were discretionary and Rivera's claim that they

did not properly respond is barred.

### 3.    **"Policy requires absolute separation of gang enemies."**

Rivera has alleged in his Complaint that prison officials knew or should have

known he was at risk of being harmed and that they ignored that risk.   See Compl.

(Doc. 1).   More specifically, Rivera claims that he made staff aware that he should

be separated from inmate Turning Bear and not placed in the same recreation cage

due to his "ex-gang" status and that staff ignored that request and placed them in the

same recreation cage on June 4, 2010.   Id. ¶¶ 19-28.   In response to the United

States' discretionary function argument, Rivera states that "policy requires absolute

separation of gang enemies."   Pl.'s Br. in Opp'n (Doc. 38) at 7.

By Rivera's own admission, he never requested that he be separated from inmate Turning Bear.   Pl.'s Counter Statement of Facts (Doc. 37), ¶ 15.   In fact, summary judgment evidence submitted by the United States reveals the two did not become "separatees" until after-- and only as a result of-- the June 4, 2010 incident. SMF ¶¶ 63-64.   In light of the lack of separatee status between the two inmates, the staff's decision to place them in the same recreation cage falls within the discretionary function exception.   See Br. in Support of the United States' Mot. for Summ. J. (Doc. 26) at pp. 8-13.

Rivera's opposition materials question the discretionary nature of prison staff's actions, claiming that the BOP's regulation at 28 C.F.R. § 524.72(d) and (f) make separation "mandatory for inmates known to be gang enemies."   See Pl's Br. in Opp'n (Doc. 38) at 8.   He further argues that, pursuant to BOP Program Statement 5217.01, § 5, "keeping designated "separatees" apart is not a matter of discretion."   Id. at 9.

The regulation upon which Rivera relies, 28 C.F.R. § 524.72, does nothing more than define the various assignment categories of Central Inmate Monitoring ("CIM") cases.   Subsections (d) and (f), specifically, state:

> (d) Disruptive group.   Inmates who belong to or are closely affiliated
> with groups (e.g., prison gangs), which have a history of disrupting
> operations and security in either state or federal penal (which includes

correctional and detention facilities) institutions. This assignment also includes those persons who may require separation from a specific disruptive group.

and

(f) Separation.   Inmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future. Factors to consider in classifying an individual to this assignment include, but are not limited to, testimony provided by or about an individual (in open court, to a grand jury, etc.), and whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals, either in the community or within the institution. This assignment also includes those inmates who have provided authorities with information concerning the unauthorized or illegal activities of others. This assignment may also include inmates from whom there is no identifiable threat, but who are to be separated from others at the request of the Federal Judiciary or U.S. Attorneys

28 C.F.R. § 524.72(d), (f).

In order to appropriately respond to Rivera's claims, the United States has obtained the declaration of SIA James Fosnot.   SIA Fosnot explains that there are only five "Disruptive Groups" recognized by the BOP:   Black Guerilla Family; Aryan Brotherhood; Mexikanemi; Mexican Mafia; and Texas Syndicate.   See Ex. 9, ¶¶ 5-6.   Also, the BOP monitors inmates that are considered "Security Threat Groups."   See Ex. 9, ¶¶ 5-6, 8.   The only "groups" that the BOP keeps completely

13

apart from each other are Mexican Mafia/Surenos from the Texas Syndicate and Bario Azteca from the Border Brothers.   Id. ¶ 9.

At the time of the June 4, 2010, altercation, Rivera was a "Tango Associate." Id.   Turning Bear was not affiliated with a gang.   Id.   As such, neither inmate belonged to a "Disruptive Group."   Nor were the inmates ever assigned a CIM category of "separation" from each other.   SMF ¶ 15; Pl.'s Counter Statement of Facts (Doc. 37) ¶ 15.   As such, Rivera's argument that § 524.72(f) and (d) and Program Statement 5217.01 make it mandatory for "disruptive group" and "separation" assignees to be separated is irrelevant to the instant case as neither Rivera nor Turning Bear fell into these categories prior to June 4, 2010.

### 4.   **"Notification of gang animosity is not a discretionary matter."**

The United States has argued for summary judgment because the discretionary function exception bars Rivera's claim that prison officials were negligent in placing Rivera and Turning Bear in the same recreation cage.   See Br. in Support of the United States' Mot. for Summ. J. (Doc. 26) at pp. 8-13.   In response, Rivera contends that "Notification of gang animosity is not a discretionary matter."   See Pl.'s Br. in Opp'n (Doc. 38) at 9.

Rivera has submitted the declaration of inmate Todd A. Dunham (who Rivera says witnessed the stabbing), to set forth what inmate Dunham believes to be

14

"recognized procedures" concerning "intelligence about gang animosity."   <u>See</u> Pl.

Br. in Opp'n (Doc. 38) at 10; Ex. A (Doc. 40-1).   Dunham's declaration is also

alleged to support an argument that, pursuant to 28 C.F.R. § 524.71, staff at USP

Lewisburg --specifically, Officers Lesho and Harvey—could have imposed a CIM

classification upon Rivera and, in any case, failed to notify the institution's Case

Management Coordinator ("CMC") "of the need for such reclassification."   <u>See</u>

Pl's Br. in Opp'n (Doc. 38) at 9.

Inmate Dunham's declaration states that Officers Lesho and Harvey were

responsible for putting the recreation lists together and determining which inmates

could be put in the same recreation cage.   <u>See</u> Pl.'s Ex. A (Doc. 40-1), ¶ 2.

Dunham avers that, at times, Officer Harvey would place Rivera or Turning Bear in

his recreation pen rather than recreate the two inmates together.   <u>Id.</u> ¶ 3.   Dunham

"believes" that Officers Harvey and Lesho followed proper procedures but he also

"believes" they were "denied by the administration to make the change."   <u>Id.</u>   He

also "believes" Officer Harvey was aware of the need for separation but did not want

to "escalate it by speaking loudly" for anyone to hear.   <u>Id.</u> ¶ 4.   Finally, Dunham

"believes" that Rivera's and Turning Bear's requests to be separated were denied

"for no reason given other than a blatant disregard to either one's well being."   <u>Id.</u>

¶ 6.

In order to rebut these statements by inmate Dunham and to set the record straight regarding the procedures utilized by BOP when an inmate states a safety concern, the United States submits the sworn declarations of Deputy Captain Brent Taggart and Correctional Officers J. Lesho and R. Harvey.   See Exs. 10, 11, and 12. As indicated therein, neither Officer Lesho nor Officer Harvey were on duty on June 4, 2010.   Ex. 11, ¶ 3; Ex. 12, ¶ 3.   Additionally, neither Officer recalls Rivera ever raising any safety concerns to them prior to June 4, 2010.   Id.   While Officer Harvey recalls conversations with Rivera--including a statement that he did not like to go to recreation with Native American inmates—he states that Rivera never stated any safety concerns.   Ex. 12 ¶ 3.

As inmate Dunham alludes to in his declaration, inmates can raise safety/security concerns with any staff member.   Ex. 10, ¶ 5.   If an inmate feels he cannot be housed or participate in recreation with another inmate, he can notify staff who will forward the information on (generally to a supervisor such as lieutenant or unit manager) as well as the special investigative staff ("SIS") who will investigate the claim.   Id.   The inmates will be unofficially kept away from each other pending the outcome of the investigation.   If the claims are substantiated, then the inmates become official separatees.   Inmates who are involved in an altercation against each other are immediately made separatees.   Id.   Additionally, it must be emphasized

once again that participation in recreation is voluntary.   As such, if Rivera had any concerns with being in a recreation cage with Turning Bear, he could have refused to participate at any time.   Id. ¶ 3.

Rivera argues that Officers Harvey and Lesho had a "mandatory" duty to notify appropriate officials of the need to separate him and Turning Bear based on language set forth in Defendant's Exhibit 2 (quoting 28 C.F.R. § 524.75).   Section 524.75 (governing the Periodic Review of CIM cases) states, "*[w]hen staff believe* that removal or modification of a CIM classification is appropriate, the institution's CMC and the appropriate reviewing authority must be notified."   See Pl's Br. in Opp'n (Doc. 38) at 9.   In the first place, despite Rivera's attempts to convince the Court otherwise, the very phrase "*when staff believe*" entrusts staff with discretion. By its language, it clearly indicates that staff's decision is discretionary in nature. More fundamentally, the United States disputes the very applicability of 28 C.F.R. § 524.75 to this case since Rivera was not a CIM case prior to June 4, 2010 and, as such, there was no CIM classification involved which could be either "removed" or "modified."

Furthermore, Rivera's argument is rendered moot by his own evidence (i.e., inmate Dunham's declaration) which demonstrates that Officers Lesho and Harvey "followed the proper procedures" and notified the "administration," even though

17

their requests were purportedly denied.   <u>See</u> Pl.'s Ex. A (Doc. 40-1), ¶ 3.   While

Officer Lesho's and Officer Harvey's sworn statements indicate that they never had

reason to be concerned with Rivera's safety, they also state that if they had, they

would have notified the shift lieutenant and/or the SIS.   Ex. 11 ¶ 3; Ex. 12 ¶ 3.   In

light of the discretionary language of § 524.75, any claim by Rivera that staff failed

to notify the appropriate authorities of the "removal or modification of a CIM

classification" would be barred by the discretionary function exception to the FTCA.


In sum, the BOP's decisions of where and how to place inmates and how to

respond to emergency situations are matters protected by the discretionary function

exception of the FTCA.   "The existence of some mandatory language does not

eliminate discretion when the broader goals sought to be achieved necessarily

involve an element of discretion."   <u>Miller v. United States</u>, 163 F.3d 591, 595 (9th

Cir. 1998).

In response to Rivera's final argument that "Defendant cannot cite a single

binding authority requiring this court to bar an inmate's claim simply because the

injury was inflicted by another inmate" (Pl's Br. in Opp'n (Doc. 38) at 11), the

United States refers Rivera to the string of citations set forth on page 12 of its brief.

<u>See also</u> this Court's recent decision of <u>Richard Anamanya v. Federal Bureau of</u>

18

Prisons, No. 3:CV-11-1394, slip op. at 16-18 (M.D. Pa. July 10, 2012) (Rep. and Recomm.) (Carlson, M.J.), adopted by No. 3:CV-11-1394, slip op. (M.D. Pa. Jan. 31, 2013) (Kosik, J.) (copy attached).

Rivera's opposition brief makes reference to a recent Third Circuit nonprecedential opinion, Gray v. United States, No. 11-3918, 486 Fed. Appx. 975, 2012 U.S. App. LEXIS 12988 (3d Cir. 2012), in which the discretionary function exception was found to be inapplicable to an officer's failure to collect a razor because a specific prison policy setting forth a procedure for prison staff to follow in the collection of its razors was determined not to involve an element of judgment or choice.   See Pl's Br. in Opp'n (Doc. 38) at 4-5.   In a footnote, Rivera noted that, while the Gray court also affirmed "another aspect of the negligence claim, in which the plaintiff blamed the prison for not separating him from his cellmate after being informed that hostility existed between them and violence was likely … the court explained that it affirmed just because the plaintiff did not present that issue on appeal."   Id. at 5, n.1.   That statement takes Rivera only so far.   Although the Third Circuit did not address this issue, Chief Judge Kane very much did address this issue and concluded-- without objection or appeal by the plaintiff-- that "the discretionary function exception bars federal prisoners' FTCA claims regarding

injuries by fellow inmates,…   <u>Gray v. United States</u>, No. 1:CV-10-1772, slip op. at 4 (Sept. 30, 2011) (copy attached).

**B.**   <u>**Rivera's claim that prison officials failed to check for weapons fails to state a prima facie claim of negligence.**</u>

Rivera avers that prison officials had a duty to search inmate Turning Bear to ensure he was not hiding a weapon prior to being placed in the recreation cage. Compl. (Doc. 1) ¶¶ 31-32.   The United States has set forth an argument and documentation in support of its motion for summary judgment to establish that, in order to meet its duty to keep Rivera and all inmates safe from harm, the BOP provides yearly training and has post orders in place to instruct its staff members on the subject of, inter alia, how to search and escort inmates who are removed from the cells.   <u>See</u> Br. in Support of the United States' Mot. for Summ. J. (Doc. 26) at 14-16; SMF ¶¶ 16-34.   The United States has also provided the sworn declaration of one of the officers on duty that day who attests to the fact that he has escorted hundreds, if not thousands, of inmates and that these procedures are followed by staff in accordance with their annual training and the procedures set forth in the Z Block's Special Post Orders.   <u>Id.</u> ¶¶ 35-46; Ex. 5 ¶ 3.

In response to the United States' argument, Rivera first directs the Court's attention to <u>Bistrian v. Levi</u>, 696 F.3d 352, 365 (3d Cir. 2012), in order to discuss

the "pleading standard" this Court should employ in deciding the United States'

summary judgment motion.   Bistrian, however, concerned the appeal of a denial

of a motion to dismiss (not a motion for summary judgment) in a Bivens action.

The pleading standard discussed by the Bistrian Court applies only to motions to

dismiss; it has no relevance to motions for summary judgment.[2]

Next, Rivera argues the theory of res ipsa loquitur:

> Pennsylvania courts accept the theory of res ipsa loquitur.   Quinby v.
> Plumstead Family Practice, Inc., 907 A.2d 1061, 1069 n.13 (Pa.
> 2006).   Accordingly, "a plaintiff may satisfy his burden of producing
> evidence of a defendant's negligence by proving that he has been
> injured by a casualty of a sort that normally would not have occurred
> in the absence of the defendant's negligence."   Id. at 1071.   This is
> exactly what Mr. Rivera has done.   The only way for the metal
> weapon to get into the recreation cage was for prison staff to neglect
> to follow mandatory procedures with regard to use of metal detectors.[3]

---

2 Moreover, the Bistrian decision only concerned the plaintiff's Bivens claims since
that plaintiff's FTCA claims had been previously dismissed and no appeal was taken
as to that decision.   696 F.3d at 363.

3 Rivera's Counter Statement of Facts states:   "[t]here is no policy, training, or
screening procedure in place to prevent prison staff members themselves from
carrying sharpened metal weapons into the recreation cages."   Pl.'s Countern
Statement of Facts (Doc. 37) ¶ 4.   In light of this bold inference that the correctional
officers themselves may have been responsible for providing the weapon which
caused Rivera's injuries, the United States submits the sworn declaration of Brent
Taggart to rebut these claims.   As set forth therein, USP Lewisburg has a screening
procedure in place to prevent staff from bringing sharpened instruments, firearms,
and other hazardous materials into the institution.   See Ex. 10, ¶ 2 and p. 4 (Excerpt
of Institution Supplement 5511.11A).

> The only way for Mr. Rivera to be rendered vulnerable to a gang
> enemy was for prison staff to neglect to follow mandatory procedures
> with regard to notifying superiors of a separation need.   The only
> way for him to be stabbed fifteen times while [correctional officers]
> stood by watching was for prison staff to neglect to follow mandatory
> procedures with regard to immediate response to emergencies.
> These are not conclusory allegations; they are entirely plausible
> inferences supported by Pennsylvania case law.

Pl.'s Br. in Opp'n (Doc. 38) at 14-15.

Rivera places too much reliance on what is, in the last analysis, nothing

more than a rule of evidence.   Quinby v. Plumstead Family Practice, Inc., 589 Pa.

183, 907 A.2d 1061 (2006).   "Res ipsa loquitur allows juries to infer negligence

from the circumstances surrounding the injury."   Id., 589 Pa. at 199, 907 A.2d at

1071.   It is "a shorthand expression for circumstantial proof of negligence-a rule

of evidence."   While res ipsa loquitur can assist a plaintiff "in proving a breach of

duty," it "provides no assistance to a plaintiff's obligation to demonstrate a

defendant's duty, that a breach of that duty was a substantial factor in causing

plaintiff harm, or that such harm resulted in actual damages."   Id., n.15.

In Gilbert v. Korvette, 457 Pa. 602, 611, 327 A.2d 94, 100 (1974), the

Pennsylvania Supreme Court adopted § 328D of the Restatement (Second) of Torts

(1965), titled Res Ipsa Loquitur, as the evidentiary rule for circumstantial proof of

negligence.   Under § 328D:   "[i]t may be inferred that harm suffered by the

plaintiff is caused by negligence of the defendant when (a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff."   Quinby, supra, 589 Pa. at 199, 907 A.2d at 1071 (quoting Rest. (Second) Torts § 328D.   A plaintiff "must establish the three elements set forth in section 328D(1) before an inference of negligence can be drawn from an injurious event."   Micciche v. Eastern Elevator Co., 435 Pa. Super. 219, 226, 645 A.2d 278, 281 (1994) (citing Leone v. Thomas, 428 Pa. Super. 217, 630 A.2d 900 (1993)).

In the instant case, the United States submits that Rivera has failed to fulfill the first two requirements of Section 328D(1):   that the event must be of a kind which ordinarily does not occur in the absence of negligence and that other responsible causes are sufficiently eliminated.   Rivera would have the Court believe that a metal weapon can only get into a recreation cage by the neglect of prison staff "to follow mandatory procedures with regard to the use of metal detectors."   (Pl.'s Br. in Opp'n (Doc. 38) at 14).   There is no factual or legal basis which compels this conclusion.   Accidents can occur even when there are mandatory procedures.   The Court is not compelled to presume that the staff was

negligent in the performance of their duties simply because Rivera invokes the

theory of res ipsa loquitur and claims that the event could not have otherwise

occurred.   "The mere fact that an accident occurred does not give rise to an

inference that the injured person was the victim of negligence." Swift v.

Northeastern Hosp. of Philadelphia, 456 Pa. Super. 330, 335 (Pa. Super. Ct. 1997) .

"[E]stablishing a breach of a legal duty is a condition precedent to a finding of

negligence."   Id. (citation omittted).

It is an unfortunate fact of prison life that inmate on inmate attacks occur.

The Third Circuit recently recognized that

> [a]ssaults by inmates on both staff and other inmates are a major
> problem facing the federal prison system. From January to May 2012,
> there were approximately 215 serious assaults by inmates on other
> inmates and twelve serious assaults by inmates on prison staff. *See*
> Federal Bureau of Prisons, Assault Graphs, *available at*
> http://www.bop.gov/news/research_projects/assaults/assaults.jsp (last
> visited Oct. 12, 2012). For the same time period, there were over 1,000
> less serious assaults by inmates on other inmates as well as nearly 700
> less serious assaults by inmates on prison staff.

Denny v. Schultz, 2013 WL 563347, *5 (3d Cir. Feb. 15, 2013) (copy attached).

The fact that such attacks occur in the prison setting affords no basis for assuming

that any such attack must be presumed to be due to the negligence of prison officials.

In addition, it remains Rivera's burden to "introduce evidence eliminating other responsible causes of the incident," Divittorio v. United States, 63 Fed. Appx. 604, 608 (3d Cir. 2003)(copy attached), before he may invoke res ipsa loquitur.

As to this third requirement, there was a third party responsible for Rivera's injury who must be eliminated by Rivera in order for res ipsa loquitur to apply: inmate Turning Bear.    It is Rivera's burden to adduce evidence which "would eliminate third parties … as possible causes of the [incident]."    Lonsdale v. Joseph Horne Co., 587 A.2d 810, 814-15 (1991).    Here, the intervening criminal act of Turning Bear is the obvious cause of Rivera's injury.

Not only did inmate Turning Bear escape prison officials' search of weapons on him, he is solely responsible for attacking Rivera in the recreation cage on June 4, 2010.    Res ipsa loquitur "is a rule that provides that a plaintiff may satisfy his burden of producing evidence of a defendant's negligence by proving that he has been injured by a casualty of a sort that normally would not have occurred in the absence of the defendant's negligence."    Quinby v. Plumstead Family Practice, Inc., 907 A.2d at 1071.    Here, Rivera's injuries would not have occurred without Turning Bear's criminal actions.    In light of Rivera's failure to introduce evidence eliminating other responsible causes of the incident, the theory of res ipsa loquitur is completely inapplicable in this case.

Accordingly, Rivera has failed to establish the United States breached its

duty to him or such alleged breach was the proximate cause of any injury.

Therefore, Rivera has failed to state a claim of negligence and the United States of

America is entitled to judgment as a matter of law.

## IV.   <u>Conclusion</u>

Based upon the above, the United States respectfully requests that the Court

grant its Motion for Summary Judgment.

Respectfully submitted,

PETER J. SMITH
United States Attorney

<u>s/ Justin Blewitt                            </u>
JUSTIN BLEWITT
Assistant U.S. Attorney
PA 01710
MICHELE E. LINCALIS
Supv. Paralegal Specialist
P.O. Box 309
Scranton, PA 18501-0309
Phone:   (570) 348-2800
Facsimile: (570) 348-2830
Date:   March 8, 2013                Justin.Blewitt@udoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JASPER RIVERA,** | : | **No. 3:CV-12-1339** |
| **Plaintiff** | : | |
| | : | |
| | : | **(Kosik, J.)** |
| **V.** | : | **(Carlson, M.J.)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Defendant** | : | **Filed Electronically** |

### CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on March 8, 2013, she served a copy of the attached

### REPLY BRIEF IN SUPPORT OF THE UNITED STATES'
### MOTION SUMMARY JUDGMENT

via the Court's electronic case filing system to the electronic mail address stated below:

Addressee:

Marianne Sawicki, Esquire
2530 Blair Avenue
Huntingdon, PA   16652
MarianneSawicki@verizon.net

s/ Michele E. Lincalis
Michele E. Lincalis
Supv. Paralegal Specialist
