**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JASPER RIVERA,** | : | **Civil No. 3:12-CV-1339** |
| | : | |
| **Plaintiff** | : | **(Judge Kosik)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Defendant** | : | |

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Now pending before the Court is the United States' motion for summary judgment on plaintiff Jasper Rivera's Federal Tort Claims Act claim that the plaintiff brought after being stabbed more than a dozen times by a fellow inmate in an exercise cage at the United States Penitentiary in Lewisburg, Pennsylvania.  The plaintiff claims that his injuries from this assault were proximately caused by the negligence of prison officials, whereas the United States argues that the "discretionary function" exception to the FTCA provides a complete bar to the plaintiff's claim.  The United States also maintains that the plaintiff has failed to adequately support his claim for negligence in this case.  The motion for summary judgment is fully briefed and has been referred to the undersigned for purposes of preparing this report and recommendation.

## A. Background and Statement of the Case

Jasper Rivera is an inmate in the custody of the Federal Bureau of Prisons, and is serving a 300-month prison sentence for carjacking, use of a firearm during commission of a crime of violence, and escape from federal custody. Prior to his transfer to the United States Penitentiary in Beaumont, Texas, Rivera was housed in the Special Management Unit at the United States Penitentiary in Lewisburg, Pennsylvania. While there, on June 4, 2010, Rivera was attacked by another inmate, Nicholas Turning Bear, while confined within an exercise cage where the men had been placed together.[1] As their hour in the exercise cage drew to a close, Turning Bear assaulted Rivera, stabbing him approximately 15 times in the head, chest, and upper torso with a homemade steel knife that Turning Bear had brought to the exercise cage concealed on his person. After Turning Bear failed orders to cease the assault, staff dispensed two rounds with a pepperball launcher, after which Turning Bear discontinued assaulting Rivera, laid down on the ground, and submitted to authority. Rivera was transported to an outside medical facility due to the severity of the puncture wounds he suffered during the attack, and Turning Bear was taken to

---

[1] According to the United States, for five out of seven days per week, inmates confined in the Special Management Unit at USP-Lewisburg are locked in their cells for 23 hours per day, with one hour of daily recreation time in an exercise cage where they are placed with one or more other inmates. Two days a week inmates are locked in their cells with their cell mates for 24 hours per day.

another cell at the prison. The plaintiff remained at an outside medical facility for nearly a week receiving treatment for his injuries.

Rivera filed an administrative tort claim with the Bureau of Prisons, asserting that the injuries he suffered were the direct consequence of staff negligence, through their decision to place the plaintiff and Turning Bear in the same exercise cage despite the fact that the plaintiff was a former gang member who had dropped out of gang life, and despite the plaintiff's claims that he had concerns about Turning Bear and wanted to be separated from him. (Doc. 27, Ex. A. Declaration of Michael Romano (Attach E).) The plaintiff has also alleged that prison officials failed to comply with explicitly mandatory policies established at USP-Lewisburg that require officers to screen inmates like Turning Bear with metal detectors before moving them from Z-Block at the prison's Special Management Unit, thereby allowing Turning Bear to bring a lethal steel weapon with him to the exercise cage he would share with Rivera. Lastly, the plaintiff has claimed that staff was negligent for failing to intervene promptly once the assault began, thereby allowing Turning Bear to continue the vicious knife assault on the plaintiff while the two men were locked inside a cage together. (Id.)

The plaintiff's administrative claim arising out of this matter was relatively modest, demanding $12,000 for the injuries suffered as a result of the alleged

negligence of prison staff. Nevertheless, despite the seriousness of the injuries Rivera suffered, the BOP's Regional Counsel, Michael Tafelski, denied the plaintiff's administrative claim on January 13, 2012, finding that staff responded immediately and appropriately to the assault on June 4, 2010, and finding no evidence that staff was aware of any separation concerns between the plaintiff and Turning Bear prior to the attack. (Id.)

## B.    Procedural History

This litigation followed, with the plaintiff filing a *pro se* complaint on July 11, 2012. (Doc. 1.) In the complaint, the plaintiff brings a single claim pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., seeking $12,000 in damages, claiming that prison officials failed to protect him from Turning Bear's assault on June 4, 2010. Specifically, the plaintiff avers that: (1) he should have been separated from Turning Bear and not placed in the same recreation cage as him; (2) staff had a duty to search inmates and their cells for weapons, and this was not done in this case; and (3) staff delayed unreasonably in breaking up the assault. (Id.)

On October 24, 2012, the United States moved for summary judgment, (Doc. 16.), and after being granted an enlargement of time, filed a brief in support of its motion and a statement of undisputed facts on December 5, 2012. (Docs. 26, 27.) On January 2, 2013, *pro bono* counsel entered her appearance on the plaintiff's behalf,

and after being granted an extension, filed a brief in opposition to the motion on February 8, 2013. (Doc. 38.) The plaintiff also filed a counterstatement of facts pursuant to Local Rule 56.1. (Doc. 40.) The United States filed a reply brief on March 8, 2013 (Doc. 43.), to which the plaintiff filed a sur-reply on March 15, 2013, (Doc. 47).[2]

The motion for summary judgment is thus fully briefed and ripe for disposition. Upon consideration, notwithstanding the broad application that courts have given the discretionary function exception to the Federal Tort Claims Act in inmate assault cases, we are constrained to find in this particular case that exception does not compel summary judgment in the United States' favor. While we find that Rivera's claim relating to the alleged failure of staff to intervene after this assault began fail under the FTCA since deciding when to intervene in a knife-wielding assault is a quintessentially discretionary function, upon careful review of the evidentiary record

---

[2] The plaintiff actually moved to strike the defendant's reply brief, arguing that it contained a number of misrepresentations, and otherwise was filled with objectionable argument. (Doc. 47.) Upon consideration, the Court denied the plaintiff's motion to strike, and construed it instead as a sur-reply brief. (Doc. 58.) At this point, relations between counsel for the plaintiff and the United States appear to have become needlessly acrimonious, and the plaintiff's new counsel moved for the imposition of sanctions – in the form of attorney's fees – against the United States due to what she claimed was the need to research and prepare a motion to strike the government's reply brief. The Court will not at this time address what risks becoming, in effect, a case-within-a-case, but will instead take up the plaintiff's motion for sanctions in a separate order.

in this case, we find at least some evidence to support the plaintiff's assertion that prison staff violated a mandatory obligation when they failed to screen Turning Bear with a metal detector before transporting him to the exercise cages on June 4, 2010, thereby permitting this inmate to carry with him a seven inch steel blade that he used to stab Rivera multiple times in the head and chest before he was eventually subdued. Based upon a recent decision from the United States Court of Appeals for the Third Circuit involving similar factual circumstances and a similar alleged breach of mandatory prison obligations by corrections staff, we conclude that the plaintiff's negligence claim asserts not only that USP-Lewisburg staff may have abused their discretion in his care, but also that they impermissibly failed to perform a mandatory safety check, and that this asserted failure is sufficient to permit the plaintiff's FTCA claim to survive in this case. We also find that there are disputes in the record that raise questions about whether the plaintiff informed corrections officers about his safety concerns with respect to Turning Bear, and whether prison staff at USP-Lewisburg had an obligation to keep Rivera and Turning Bear separated pending an investigation into concerns that Rivera claims he raised with corrections officers about his safety.

Accordingly, although we believe there are significant questions about whether the plaintiff will ultimately be able to show that the failure of prison officials to

separate Rivera and Turning Bear are actionable under the FTCA, we do conclude that the asserted failure to screen Turning Bear for weapons, and questions about whether staff were obliged to keep these inmates separated in response to concerns that Rivera claims he raised and which BOP staff cannot recall receiving, prevent this case from being resolved on summary judgment.

## II.     **STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment.  Rule 56 provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).  The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.  "To be material, a fact must have the potential to alter the outcome of the case" under governing law. N.A.A.C.P v. North Hudson Regional Fire & Rescue, 665 F.3d 464, 475 (3d Cir. 2011).  In order for an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." In re Lemington Home for Aged, 659 F.3d 282, 290 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986)).

The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this initial requirement is met, the burden then shifts to the non-moving party to demonstrate the existence of a genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460–61 (3d Cir. 1989). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the party opposing summary judgment and draws all reasonable interests in that party's favor. See Scott v. Harris, 550 U.S. 372, 378 (2007); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott, 550 U.S. at 380).

## III. DISCUSSION

### A. The FTCA and the Discretionary Function Exception

The plaintiff brings his claim in this case under the Federal Tort Claims Act, 28 U.S.C. 1346(b), alleging that staff at USP-Lewisburg were negligent in their

decision to place him in the same exercise cage with Nicholas Turning Bear on June 4, 2010, particularly because the plaintiff contends that both he and Turning Bear advised corrections staff that they should not be caged together due to the potential for violence. It appears from the pleadings that the plaintiff is a self-described gang "dropout", whereas the plaintiff believes that Turning Bear may have had some unspecified gang affiliation, a circumstance which the plaintiff alleges frequently leads to violence between inmates.[3] The plaintiff also alleges that prison officials were negligent by failing to follow prison policies that the plaintiff claims required staff to use a metal detector on all inmates to ensure that the inmates did not carry contraband or weapons on them into an exercise cage. Lastly, the plaintiff claims that prison staff was negligent in responding to the attack once it began, and in forcing its conclusion despite having the ability to discharge pepperballs or other instruments to ensure that Turning Bear's assault was halted.

---

[3] The United States has submitted evidence showing that at the time of the incident, its records showed that Rivera was affiliated as a Tango Associate, whereas Turning Bear had no identified gang affiliation. (Doc. 43, Ex. 9, Declaration of James Fosnot ¶¶ 10-11.) We believe the focus on whether inmates had adverse gang affiliations is not controlling at this stage of the litigation, where Rivera claims that he notified staff of safety concerns with Turning Bear, and where the defendant has submitted evidence showing that when inmates raise safety concerns with staff these concerns will be reported and investigated. Whether Rivera did raise these concerns, and if so whether USP-Lewisburg staff had a mandatory duty to report these concerns or take other action in response are open questions.

The United States has defended against Rivera's claim by asserting that the discretionary function exception to the FTCA's waiver of sovereign immunity applies to the plaintiff's claim in this case, and to each of the plaintiff's theories offered in support of that negligence claim. Thus, the plaintiff endeavors to argue that "explicit procedures," rather than discretionary functions, "cover all four aspects of Mr. Rivera's negligence claim" and cause summary judgment to be inappropriate in this case. (Doc. 38, at 5.)

"The FTCA 'was designed primarily to remove the sovereign immunity of the United States from suits in tort, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances.'" Sosa v. Alvarez-Machain, 542 U.S. 692, 700 (2004) (quoting Richards v. United States, 369 U.S. 1, 6 (1962)); CNA v. United States, 535 F.3d 132, 138 (3d Cir. 2008). Under the FTCA federal district courts have jurisdiction over civil actions against the United States for damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under the circumstance where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). A person is permitted to sue under the FTCA to recover

damages from the United States for personal injuries that he suffered during confinement in a federal prison that resulted from the negligence of a government employee. See Rinaldi v. United States, No. 1:09-CV-1700, 2010 U.S. Dist. LEXIS 66024, at *11 (M.D. Pa. July 1, 2010) (Rambo, J.) (citing United States v. Muniz, 374 U.S. 150 (1963)).

The FTCA's waiver of sovereign immunity for tort claims in a prison context is tempered, however, by a number of statutory exemptions including a "discretionary function" exemption set forth in 28 U.S.C. § 2680(a), which provides that liability may not be premised on a claim against a government employee which is "... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty...".

In a federal prison setting:

> To determine if the discretionary function exception applies, a court must first determine if the challenged conduct involves an " 'element of judgment or choice.' " See Mitchell v. United States, 225 F.3d 361, 363 (3d Cir.2000) (citing United States v. Gaubert, 499 U.S. 315, 322-23 (1991) and Berkovitz v. United States, 486 U.S. 531, 536 (1988), and noting that there is no element of judgment or choice if " 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow' "). If the challenged conduct involves an element of judgment, a court must go on to consider " 'whether that judgment is of the kind that the discretionary function exception was designed to shield.' " Id.

Brown v. U.S. Justice Dep't, 271 F. App'x 142, 145 (3d Cir. 2008). See Koch v.

United States,814F.Supp. 1221, 1227 (M.D. Pa. 1993). The discretionary function "exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals' United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808(1984)." Cestonaro v. United States, 211 F.3d 749, 753 (3d Cir.2000). As a jurisdictional boundary line, if an act falls within the discretionary function exception, then there has been no waiver of sovereign immunity as to that conduct and the court lacks subject matter jurisdiction to entertain a tort claim against the United States. See Cohen v. United States, 151 F.3d 1338, 1340 (11th Cir. 1998).

Here, the Plaintiff's tort claims, which arise in the context of an inmate assault within a federal prisoner, potentially transgress this jurisdictional boundary defined by the FTCA's discretionary function exemption since:

> Courts within this circuit and others have uniformly held that federal prisoners' FTCA claims for injuries by fellow inmates are barred by the discretionary function exception. See, e.g., Donaldson v. United States, 281 F. App'x 75, 76-78 (3d Cir.2008); Castillo v. United States, 166 F. App'x 587, 589 (3d Cir.2006); Michtavi v. United States, C.A. No. 4:07-CV-0628, 2009 WL 578535, at *9-10 (M.D.Pa. Mar.4, 2009); Baker v. United States, C.A. No. 06-147, 2006 WL 3717382, at *6 (W.D.Pa. Dec. 14, 2006); Macias v. United States, C.A. No. 05-1445, 2006 WL 1843111, at *3-4 (D. N.J. June 30, 2006); Redmond v. United States, C.A. No. 4:04-CV-231, 2006 WL 709347, at *3-4 (M.D.Pa. Mar.20, 2006); Graham v. United States, C.A. No. 97-1590, 2002 WL

> 188573, at *4 (E.D.Pa. Feb.5, 2002). While prison officials have a statutory duty to provide for the "safekeeping" of inmates, 18 U.S.C. § 4042, this statute leaves the implementation of these duties to the discretion of prison officials, and "how best to protect one inmate from the threat of attack by another is of the kind that the discretionary function exception was designed to shield." Donaldson, 281 F. App'x at 77.

Rinaldi v. United States, No. 09-1700, 2010 WL 4642498, *4 (M.D.Pa. Nov. 9, 2010).

Indeed, the United States Court of Appeals for the Third Circuit has previously addressed cases in which a federal inmate has brought a tort claim against the government for its allegedly negligent placement of a prisoner with other inmates who later harm him. See, e.g., Donaldson v. United States, 281 F. App'x 75, 76-78 (3d Cir.2008); Castillo v. United States, 166 F. App'x 587, 589 (3d Cir.2006). In terms that have some relevance here, the court of appeals have frequently held that the discretionary function exemption applied in this setting and barred FTCA claims against the government.

In reaching this result the court reasoned that typically both elements of the FTCA's discretionary function exemption were fully satisfied in the case presented in Donaldson where an inmate allege that prison officials were negligent in their placement of prisoners, leading to inmate-on-inmate violence. First, the court found that, while the Bureau of Prisons has a statutory obligation to ensure inmate safety,

13

"the BOP retains sufficient discretion in the means it may use to fulfill that duty to trigger the discretionary function exception." <u>Donaldson v. United States</u>, 281 F. App'x 75, 77 (3d Cir. 2008)(citations omitted). The court of appeals then concluded that:

> [T]he judgment involved in this case- i.e., how best to protect one inmate from the threat of attack by another-"is of the kind that the discretionary function exception was designed to shield." <u>Mitchell,</u> 225 F.3d at 363. Prison administrators should be afforded wide-ranging deference in implementing and executing their policies because their discretion is needed to preserve internal discipline and maintain institutional security. <u>Bell v. Wolfish</u>, 441 U.S. 520, 547-48,(1979). Supreme Court authority underscores the principle that prison officials have discretionary power over the safety of the institutions they operate. <u>See</u> <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 n. 14,(1981); <u>see also</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 321-22 (1986). Likewise, courts of appeals have applied the discretionary function exception to bar an inmate's claims for injuries he received while incarcerated. <u>See</u> <u>Calderon</u>, 123 F.3d at 948, 951 (discretionary function exception barred FTCA claim despite evidence that BOP officials knew of the threat to inmate and took *no steps* to protect him); <u>Cohen</u>, 151 F.3d at 1344 (discretionary function exception shielded the BOP from FTCA liability, where an inmate that the BOP had misclassified attacked and injured the plaintiff); <u>Alfrey v. United States</u>, 276 F.3d 557, 565 (9th Cir.2002) (where BOP officials' decision not to relocate an inmate in the face of death threats from his cellmate resulted in the inmate's death, "what steps to take in response to a reported threat" required correctional officers to "set priorities among all extant risks: the risks presented by the reported threat, along with the other risks that inevitably arise in a prison," all of which "implicate social and public-policy considerations."). In accordance with these authorities, we find that the BOP's decisions about how to protect [inmates from assaults by fellow prisoners] are the kinds of judgments that the discretionary function exception was designed to protect.

Id. at 77-78.

It is true that the Bureau of Prisons is charged by statute with providing for the "protection" and "safekeeping" of inmates, see 18 U.S.C. § 4042(a)(2), but it is equally true that the statute leaves implementation of these duties to BOP officials' discretion. See Mitchell v. United States, 225 F.3d 361, 363 (3d Cir. 2000); Cohen v. United States, 151 F.3d 1338, 1342 (11th Cir. 1998) ("explaining that "even if § 4042 imposes on the BOP a general duty of care to safeguard prisoners, the BOP retains sufficient discretion in the means it may use to fulfill that duty to trigger the discretionary function exception."). Furthermore, the Third Circuit has expressly observed that "a judgment as to the best way to protect prisoners from attacks by others 'is of the kind that the discretionary function exception was designed to shield.' " Thrower v. United States, __ F. App'x __, 2013 WL 2392823, at *2 (3d Cir. June 2, 2013) (quoting Mitchell, 225 F.3d at 363).

Thus, the discretionary function is broad in this field, and frequently is invoked to insulate the United States from virtually any liability stemming from inmate-on-inmate violence on the grounds that prison officials have total discretion in determining how best to protect inmates, even when the United States points to no evidence that prison officials actually exercised that discretion in a particular case.

At the same time, courts have declined to find the discretionary function applicable in cases where prison personnel fails to comply with non-discretionary, mandatory obligations imposed by BOP policies. Thus, the Third Circuit Court of Appeals recently held that the first step of the discretionary function analysis – whether the conduct involved an element of choice – was not satisfied where a prison official fails to comply with a mandatory obligation. See Gray v. United States, __ F. App'x ___, __, 2012 WL 2384251, at *3 (3d Cir. 2012) (first step not satisfied when prison procedures mandated that guards retrieve razors from SMU inmates after showers, and inmate alleged he was injured in a razor attack by another inmate who was negligently permitted to keep his razor).[4]

Federal courts and legal scholars have consistently emphasized that when governmental regulations, statutes or other governmental directives declare "that certain procedures 'shall,' 'will,' or 'must' be employed," they use "language of an unmistakably mandatory character." Hewitt v. Helms, 459 U.S. 460, 471 (1983); see also Campbell v. Pan American World Airways, Inc., 668 F. Supp. 139, 142 (E.D.N.Y. 1987) ("*Will*, like *shall*, is a mandatory word"); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012)

---

[4] While the Gray decision is not precedential, it is highly persuasive as a "paradigm of the legal analysis [this Court] should . . . follow." Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 n.12 (3d Cir. 1996).

(observing that to say that "[m]andatory words impose a duty" is "so obvious as to be hardly worth the saying."). In <u>Gray</u>, the Third Circuit adhered to this traditional interpretation of mandatory language in reinstating a federal inmate's FTCA claim, where that inmate was injured when his cellmate attacked him with a razor that a correctional officer failed to collect after showers.

In <u>Gray</u>, the Court of Appeals noted particularly that the institution's Handbook provided that "[a]ll razors will be accounted for and disposed of at the end of the shower." <u>Gray v. United States</u>, 2012 WL 2384251, at *3 (3d Cir. June 26, 2012) (per curiam). The court of appeals emphasized the use of the word "will" in its opinion, and held that "the language in the Handbook" laid out "a mandatory policy requiring that razors be accounted for and disposed of at the end of a shower." <u>Id.</u> "Because a 'policy specifically prescribes a course of action for [prison staff] to follow,' the task of collecting razors does not involve an element of judgment of choice and the discretionary function exception is inapplicable." <u>Id.</u> (quoting <u>S.R.P. v. United States</u>, 676 F.3d 329, 333 (3d Cir. 2012)). The court of appeals opinion makes clear that the fact that the policy did not spell out exactly how the prison staff were to account for or dispose of the razors did not diminish the mandatory nature of the duty imposed by the Handbook.

The Third Circuit's decision in Gray has relevance to the case before the Court, because the plaintiff has alleged not only that prison staff failed to exercise proper discretion in ensuring his safety, but that they disregarded a mandatory duty to subject inmates held in Z-Block at USP-Lewisburg to screening with a metal detector before transporting these inmates from their cells. In this case, the plaintiff alleges that the USP-Lewisburg correctional staff failed to use a metal detector to ensure that Turning Bear was not carrying a dangerous weapon with him to the exercise cages, and this failure permitted Turning Bear to secret a seven-inch steel blade on his person that he used to stab Rivera 15 times. Review of evidentiary materials that the United States has filed in this case appear to indicate that certain prison policies applicable to USP-Lewisburg create mandatory obligations on the part of corrections staff.

At the outset, we note that federal regulations require prison staff to deter prisoners from possessing weapons and other contraband:

> In order to further the safe, secure, and orderly running of its institutions, the Bureau of Prisons conducts searches of inmates and of inmate housing and work areas to locate contraband and to deter its introduction and movement. Staff shall employ the least intrusive method of search practicable, as indicated by the type of contraband and the method of suspected introduction.

28 C.F.R. § 552.10. The BOP considers weapons to be contraband. (Doc. 38, Ex. 1, BOP Program Statement 3420.09, "Standards of Employee Conduct," § 12.)

18

Although the regulation by its terms permits for limited discretion (e.g., "[s]taff shall employ the least intrusive method of search practicable"), the BOP appears to have exercised this discretion by <u>requiring</u> that prison staff at USP-Lewisburg use metal detectors to search inmates for weapons and contraband before an inmate from Z-Block is removed from his cell. Thus, the Special Post Orders for Z-Block at USP-Lewisburg provide: "All inmates who are removed from the cell ***will be pat searched and a hand-held metal detector utilized for screening***." (Doc. 27, Def. SMF, Ex. 1, Attach. F, Special Post Orders for Z Block at 80) (emphasis added.) Moreover, to fulfill this obligation, corrections officers at USP-Lewisburg are provided training and instruction that they are required to apply the metal detector when taking prisoners out of their cells. (Doc. 27, at 5 ¶ 10; Doc. 27-2, at 23.) It appears, therefore, that there is evidence to show that BOP has imposed a discrete, mandatory requirement on staff at USP-Lewisburg that they must screen inmates who are removed from their cells with metal detectors, and this policy appears specifically intended to avoid allowing inmates like Turning Bear from carrying lethal weapons with them as they enter the prison's exercise cages or other areas of this highly secure institution. Based upon this showing, and the dispute in the record about whether Turning Bear was searched in accordance with this apparently mandatory obligation,

we find that summary judgment based on the discretionary judgment exception to the FTCA is simply not warranted on the facts of this case.[5]

The plaintiff has also argued that mandatory policies required that he be separated from Turning Bear, but the plaintiff's reliance on BOP regulations and USP-Lewisburg procedures in this area is not as compelling.

The United States has submitted evidence to show that the BOP monitors and controls the transfer, temporary release and community activities of certain inmates who present special needs for management. (Doc. 27, Def. SMF ¶ 1; Ex. 11 (Declaration of James Fosnot), ¶ 3.) Inmates who require such special management

---

[5] The United States has submitted a declaration from Jeffrey Vargeson, a correctional officer at the time of the incidents alleged in this case. (Doc. 27, Ex. 5.) In his declaration, Vargeson attests that on June 4, 2010, he was working as a correctional officer assigned to the East Escort #10 post, and as part of his duties he assisted the Z-Unit staff as they escorted inmates from their assigned cells to the recreation area. (Id. ¶ 2.) Vargeson represents that he has no recollection of who escorted Turning Bear to recreation on that date, but he nevertheless states that whatever officers would have been involved would have been searched and subjected to screening with a hand held metal detector over his entire body, both front and back. (Id. ¶¶ 3, 4.) We do not find that this declaration is sufficient to warrant summary judgment in favor of the defendant in this case, as it does not speak directly to who screened Turning Bear on the date of the incident, and speaks only in terms of what "would have" been done in the ordinary course. The record also shows that this inmate was somehow able to be transported to the recreation cages while in possession of a steel blade estimated to be approximately seven inches long, which was undisputedly used during the assault of Rivera. Whether a metal detector would have discovered this lethal instrument is not addressed in the defendant's moving papers and evidentiary materials.

are known as Central Inmate Monitoring Cases (CIM), and require a higher level of review for transfers, temporary releases or community activities. (SMF ¶ 2; Ex. 11, ¶ 3.) BOP undertakes such monitoring in order to provide protection to all concerned, and to contribute to the safe and orderly operation of federal institutions. (SMF ¶ 3; Ex. 11, ¶ 3.)

The CIM category of "Separation" includes inmates who may not be confined in the same institution, unless the institution has the ability to prevent physical contact between the separatees. (SMF ¶ 5, Ex. 11, ¶ 4.) Factors that BOP officials are to consider in categorizing an inmate as a "Separation" include whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals in the community or institution. (SMF ¶ 6; Ex. 11, ¶ 4.)

Another CIM category is labeled "Disruptive Groups." (SMF, Ex. 11, ¶ 5 and p.7 (Program Statement 5180.05, Central Inmate Monitoring System), 28 C.F.R. ¶ 524.70.) Disruptive inmates include those "who belong to or are closely affiliated with groups (e.g. prison gangs), which have a history of disrupting operations and security" of correctional institutions. (Id.) In this category, the BOP recognizes five different Disruptive Groups, including: the Black Guerilla Family; Aryan Brotherhood; Mexikanemi; Mexican Mafia; and Texas Syndicate. (SMF, Ex. 11, ¶ 6.)

In addition, the BOP monitors a category of inmates labeled as Security Threat Groups. (Id. ¶ 8.) Security Threat Groups may include gangs including the Latin Kings; Paisa; Dirty White Boys; Aryan Circle; Crips; Bloods; Black Gangster Disciples; and Vice Lords. (Id.) This group also includes inmates who are former law enforcement, sex offenders, inmates who have threatened government officials, or who have a history of assaulting officers. (Id.)

According to the evidence submitted by the BOP, the only recognized groups that the BOP keeps completely separate from each other are the Mexican Mafia/Surenos from the Texas Syndicate, and Bario Azteca from the Border Brothers. (Id. ¶ 9.)

The United States Penitentiary at Lewisburg is almost entirely populated by inmates who have been designated to that facility for special management needs, due to persistent disruptive behavior, gang affiliations, or other reasons necessitating more restrictive and secure housing. Given this extremely restrictive environment, inmates at USP-Lewisburg are afforded the opportunity to participate in recreation one hour per day, for five days out of the week. At all other times, inmates are locked within their cells with their cell mates, including two days per week when inmates are confined together in their cells for 24 hours a day. (Doc. 43, Ex. 10 (Declaration of Brian Taggart), ¶ 3.) Separation records are used to ensure that inmates who are

separatees are not placed in recreation groups together.  (Id.)  Notably, recreation is voluntary, and an inmate is permitted to refuse to participate in recreation at any time before he is placed into a recreation pen.  (Id.)

However, in addition to these rules and guidelines regarding CIM and special separation concerns, if an inmate identifies concern for his safety while being moved to recreation, he may be returned to his cell or placed in a holding cell or other area while his concerns are looked into.  (Id. ¶ 4.)  However, he will not be placed in a different recreation case since the separation records for those other inmates in that cage will not have been reviewed.  (Id. ¶ 5.)

Inmates may raise safety or security concerns with any staff member.  (Id. ¶ 5.) If an inmate feels he cannot be housed or participate in recreation with another inmate, he can notify staff who will forward the information on to a supervisor such as a lieutenant or unit manager, as well as to special investigative staff ("SIS") who will investigate the claim.  (Id.)  According to the BOP, inmates who raise such concerns will unofficially be kept separate pending the outcome of the investigation. If the inmate's claims are substantiated, then the inmates will become official separatees.  Inmates who are involved in an altercation with one another are immediately made separatees.  (Id.)

Although the United States has offered the declaration of Brian Taggert to rebut evidence that the plaintiff has submitted to show that staff disregarded a mandatory duty to investigate his safety concerns, upon consideration we find that the declaration actually crystallizes a dispute of fact both about what concerns the plaintiff may have raised, what obligation USP-Lewisburg staff may have had to respond to such concerns, and if there was such an obligation, whether it was followed. Thus, the plaintiff claims that he informed two correctional officers, J. Lesho and R. Harvey, about his separation concerns with Turning Bear, whereas the defendant maintains that Rivera never formally notified staff of his separation request. There plainly appears to be a dispute between the parties about the manner in which Rivera may have informed staff of his concerns regarding Turning Bear.[6]

---

[6] There is no dispute in the evidence that inmates may elect not to take recreation time. Although the evidentiary record is somewhat generic in terms of what notice Rivera claims to have given officers of his concerns, his contention that officers J. Lesho and R. Harvey ignored those concerns on the date of the incident has been weakened substantially by the sworn affidavits from each of these corrections officers attesting that neither of them was on duty at the prison on June 4, and thus could not have escorted Rivera to the exercise pens, or had any involvement on that date with his placement together with Turning Bear. (Doc. 43, Exs. 11, 12, Declarations of J. Lesho and R. Harvey.) For his part, Lesho attests that he has no recollection of Rivera ever having raised a concern with him regarding Turning Bear. (Doc. 43, Ex. 11, ¶¶ 2, 3.) Officer Harvey attests that he can recall having many conversations with Rivera prior to June 4, 2010, and he recalls that Rivera did not like going to recreation with Native Americans, but Harvey swears that Rivera never expressed any safety concerns with him prior to June 4, 2010. (Doc. 43, Ex. 12, ¶ 2, 3.) Officer Harvey attested that he

The plaintiff has submitted a declaration from another inmate, Todd Dunham, who has attested that due to safety concerns that the plaintiff had raised regarding Turning Bear, Correctional Officers Lesho and Harvey would, at times, place either Rivera or Turning Bear in his recreation pen rather than having these two inmates recreate together. (Doc. 40, Ex. A, Declaration of Todd A. Dunham, ¶ 3.) Dunham attests that he believes that Officers Lesho and Harvey were aware of the need to separate Rivera and Turning Bear, but that they were somehow prevented by unidentified administration officials from changing Rivera's and Turning Bear's recreation assignments. (Id. ¶¶ 4-6.) Although we find that Dunham's affidavit about what he personally "believes" happened regarding Rivera's recreation assignment to have little value, we do believe that his representation that Officers Lesho and Harvey had previously separated Rivera and Turning Bear may have some limited bearing on the plaintiff's claims that he had notified prison officials that he had a conflict with Turning Bear. This representation is also relevant when considered in relation to

_____

endeavored to accommodate Rivera's preference of not recreating with Native Americans when resources permitted, but there were times when the only available place to put Rivera was in a recreation pen with a Native American inmate. (Id.) Harvey and Lesho both attested that if Rivera had notified either of them about safety concerns prior to June 4, 2010, they would have notified either the shift lieutenant or SIS. (Doc. 43, Ex. 11, ¶¶ 2, 3; Ex. 12, ¶ 2, 3.) However, Rivera claims that these officers had previously separated him from Turning Bear, and inmate Todd Dunham's affidavit provides some support for this assertion. (Doc. 40, Ex. A.)

other assertions made by Brian Taggart in his counter declaration that the United States offers in order to "set the record straight." (Doc. 43, at 16.)

In that declaration, Taggart, a Deputy Captain at USP-Lewisburg, represents that "[i]f an inmate identifies a safety concern while being moved to recreation he may be returned to his cell, placed in a holding cell or other area while the concern is looked into." (Doc. 43, Ex. 10, Taggart Decl. at ¶ 4.) Although this attestation suggests there is a degree of discretion that may be exercised in such cases, Taggart also attests that if an inmate identifies a safety concern with staff, they "*will* forward the information on (generally to a supervisor such as Lieutenant or Unit Manager) as well as the Special Investigative Staff who *will* investigate the claim." (Id. ¶ 5) (emphasis added.) Moreover, Deputy Captain Taggart represents that in such cases, "[t]he inmates *will* be unofficially kept away from each other pending the outcome of the investigation." (Id. ¶ 6.) If the investigation substantiates the inmate's concerns, then the inmates will be come official separatees. (Id.) Thus, Deputy Captain Taggart's summary of this reporting process at the very least suggests that if inmates bring safety concerns to staff, those concerns "will" be forwarded to supervisory staff, and to other investigative staff who "will" investigate the allegations, implying a mandatory approach to this issue. During this period, Deputy

Captain Taggart attests that the inmates "will" be kept apart from one another, until the inmate's concerns can be looked into.

This description of this process designed to address inmate safety concerns, at least as described by Deputy Captain Taggart, suggests that during at least the preliminary period after an inmate voices concerns for his safety with respect to another inmate, BOP staff at USP-Lewisburg undertake a number of mandatory obligations to respond initially to the concern. Whether that happened in this case appears to be an open question, as the United States disputes even that Rivera ever raised concerns with staff, and insists that Rivera went voluntarily into an exercise cage with Turning Bear, whereas Rivera is adamant that he told officers of his concerns, and he has provided a declaration from another inmate that seems to support this claim to some degree, and suggests that prison staff had, at one time, decided to keep the inmates separated. Ultimately, we find that here, too, there are disputed issues of fact that are not amenable to resolution on summary judgment.

In contrast to our assessment of Rivera's arguments about his separation concerns and the alleged failure of USP-Lewisburg staff to follow mandatory prison procedures to screen Turning Bear for weapons, we do not agree that Rivera has asserted a viable claim under the FTCA regarding the manner in which staff responded to the assault once it began.

Rivera claims that prison staff were negligent in failing to responding immediately and effectively once Turning Bear commenced his assault. (Doc. 1, ¶ 39.) Rivera has alleged that at least two prison staff members armed with pepper ball guns in the gun ports at the recreation cage could have responded more quickly to stop the assault once it began. (Id.) Thus, in his brief opposing summary judgment, Rivera seeks to bolster this contention by arguing that "immediate response to an emergency is mandatory." (Doc. 38, at 7.) Review of applicable policy statements reveals that although prison staff are indeed required to respond "immediately and effectively" to emergency situations when they arise, the policy statement does not mandate the way in which staff must respond, or otherwise strip prison staff of discretion in determining how best to "effectively" respond to emergencies when they arrive. (Doc. 38, at 7, quoting Program Statement 3420.09, Standards of Employee Conduct, § 10(b).)

In this case, following review of the evidentiary record we are unable to find that there is a triable issue on whether or not BOP staff was negligent in failing to respond "immediately and effectively" to the incident on June 4. As a threshold matter, it seems clear that how staff should respond to an emergency situation is committed to their discretion, judgment, and indeed the orders from superior officers that staff must obey. (See Program Statement 3420.09, Standards of Employee

Conduct, § 10 (c)) (requiring employees "to obey the orders of their superiors at all times. In an emergency situation, carrying out the orders of those in command is imperative to ensure the security of the institution.").

The record shows that within five minutes, Turning Bear assaulted Rivera, and staff promptly responded, first by ordering Turning Bear to cease his attack, and subsequently firing two rounds from a pepper ball launcher to ensure Turning Bear's total compliance when he refused initially to lay down as ordered. Thereafter, Turning Bear was subdued, placed in handcuffs, and removed from the cell. Staff took photographs to document the incident and injuries inflicted upon Rivera, and had Rivera transported to an outside medical facility where his injuries could be appropriately treated. (SMF ¶¶ 47-59; Ex. 3 (Doc. 27-2) at 7.) Rivera's contention that prison staff merely stood around and watched is belied by the record and, again, a determination of how to respond "immediately and effectively" to a dangerous situation such as the one that prison staff indisputably faced on June 4, was committed to the officers' judgment and any orders given by their superiors. We are thus unable to agree with Rivera that he has presented a triable claim on his contention that staff were negligent in responding to this serious incident. Therefore, summary judgment is appropriate with respect to the particular, discrete claim.

**B.** **Disputed Issues of Fact Preclude Summary Judgment on Rivera's Negligence Claim**

In addition to relying on the discretionary function exception as a defense to Rivera's negligence claim, the United States also argues that it is entitled to summary judgment, arguing that there is insufficient evidence to support a negligence claim as a matter of law. We disagree.

As noted above, the FTCA governs all claims against the United States "for money damages for injury or loss of personal property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2675(a). Additionally, under the FTCA, the United States will be liable "in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for . . . punitive damages." Id. at § 2674. The FTCA "provides a mechanism for bringing a state law tort action against the federal government in federal court" and the "'extent of the United States' liability under the FTCA is generally determined by reference to state law." In re Orthopedic Bone Screw Product Liab. Litig., 264 F.3d 344, 362 (3d Cir. 2001) (quoting Molzof v. United States, 502 U.S. 301, 305 (1992)).

A federal district court considering an FTCA action must apply the law of the state in which the alleged tortious conduct occurred, which in this case is Pennsylvania. See 28 U.S.C. § 1346(b). Under Pennsylvania law, a plaintiff alleging negligence has the burden of proving the following elements by a preponderance of the evidence: (1) the existence of a legal duty on the part of the defendant; (2) a breach of that duty; (3) a causal relationship between the defendant's negligence and the plaintiff's injuries; and (4) resultant damages. City of Phila. v. Beretta U.S.A. Corp., 277 F.3d 415, 422 (3d Cir. 2002) (citing Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998)).

In support of its motion for summary judgment, the United States points to evidence showing that it provides annual training to its staff to instruct them in how to search for weapons and how to escort inmates when they are removed from their cells. (Doc. 26, at 15.) In addition, the United States observes that it has issued post orders for Z-Block staff members that specifically address these issues. (Id.) The United States also echoes the procedures that are to be followed in cases where inmates on Z-Block at USP-Lewisburg are removed from their cells, including that these inmates are visually observed, pat searched, and scanned with a hand held metal detector. (Id.) We have found evidence in the record to show that these procedures were not discretionary, but were instead mandatory obligations on the part of USP-

Lewisburg staff, and we have found that there are unsettled questions as to whether the procedures may have been followed on June 4, 2010.

After acknowledging these procedures, and in an effort to prove that they were followed, the United States points to a declaration by Jeffrey Vargeson, the USP-Lewisburg officer who candidly acknowledges having no recollection of which particular officer or officers may have been assigned to escort Turning Bear on June 4, 2010, but nevertheless state that the procedures would have been followed on that day in accordance with officers' training and the procedures that were set forth in the Z-Blocks' post orders. (Doc. 27, Ex. 5, Vargeston Decl.; Def. SMF ¶¶ 35-46.) On the basis of this limited evidence, which is itself of fairly limited value given officer Vargeson's minimal recollection of the day in question, his general assertion that staff "would have" followed appropriate rules, and the additional fact that Turning Bear was undisputedly able to carry a sizeable steel blade with him to the exercise pens on June 4, 2010, cause us to find that disputed issues of fact remain that make summary judgment inappropriate.

We have discussed above the conflict in the evidence regarding the obligations of USP-Lewisburg staff to report inmate concerns about other inmates; the alleged obligation to keep inmates separated pending an investigation into those claims; whether Rivera ever raised such concerns and, if so, whether they were appropriately

addressed; and whether staff complied with the apparently mandatory obligation to screen Z-Block inmates with metal detectors whenever they are removed from their cells. These unsettled questions, taken in context of a brutal assault by Turning Bear that resulted in the plaintiff being stabbed by Turning Bear 15 times in the head and torso, compel a finding that summary judgment is unwarranted at this time.

## IV.   RECOMMENDATION

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED THAT the United States' motion for summary judgment (Doc. 16.) be GRANTED in part and DENIED in part as follows:

1.   The motion should be GRANTED with respect to Rivera's claim that prison officials negligently failed to timely intervene in this assault after it began.

2.   In all other respects the motion should be DENIED.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the

proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 12th day of August 2013

<u>**S/Martin C. Carlson**</u>
Martin C. Carlson
United States Magistrate Judge